ROBERTS, J., for the Court:
 

 ¶ 1. Following the burglary of the Junior Food Mart in Aberdeen, Mississippi, Terry Walker was indicted for burglary of a building pursuant to Mississippi Code Annotated section 97-17-33 (Rev. 2007). He was subsequently tried and found guilty in the Circuit Court of Monroe County. At the conclusion of his trial, Walker moved the court for a judgment notwithstanding the verdict or, in the alternative, a new trial. However, it was denied by the trial court. Walker was sentenced to seven years in the custody of the Mississippi Department of Corrections, with five years to serve and two years of post-release supervision. Further, Walker was ordered to pay a $1,000 fíne, a $100 assessment to the Mississippi Crime Victims’ Compensation Fund, and $885.62 in restitution to the owner of the Junior Food Mart. Walker subsequently filed his notice of appeal and argued that the jury’s verdict is against the overwhelming weight of the evidence. Finding no merit to the issue raised by Walker, we affirm his conviction and sentence.
 

 FACTS
 

 ¶ 2. In the early morning hours of February 19, 2009, the Junior Food Mart in Aberdeen, Mississippi, was burglarized. Officer Tommy Edwards, with the Aberdeen Police Department, responded to a burglary call at the Junior Food Mart at 5:00 am.
 
 [1]
 
 Officer Edwards testified that when he arrived at the Junior Food Mart he noticed that the bottom part of the front glass door had been burst out; no one was in the building; and there were cigarette packs lying on the floor as if someone had pulled them off the counter. He subsequently found the store manager’s phone number and called her.
 

 ¶ 3. Some time after Officer Edwards called the store manager, another employee of the Junior Food Mart arrived. Officer Edwards asked about the store’s surveillance video and reviewed the videotape. He identified the burglar shown on the videotape as Walker. Officer Edwards explained that he was familiar with Walker as a result of having seen him around town. Officer Edwards collected the videotape and turned it over to Major Quinell Shumpert with the Aberdeen Police Department later that morning. Major Shumpert stated that when he arrived at work the morning of February 19, 2009, he reviewed the videotape recovered from the scene and also identified the burglar shown on the videotape as Walker. He stated that he was able to identify Walker because he previously “had dealt with [Walker.]”
 

 ¶ 4. Major Shumpert, along with other law enforcement officers, subsequently executed a search warrant of Walker’s mother’s home, where he lived. Deputy Curtis Knight, an investigator with the Monroe County Sheriffs Department, accompanied Major Shumpert during the execution of the search warrant on Walker’s residence. When the law enforcement officers arrived, no one was present at the Walker home so they searched the area outside of the house. They found a Marlboro cardboard box next to a garbage can behind
 
 *654
 
 the house.
 
 [2]
 
 Major Shumpert picked up the box, placed it in his vehicle, and waited while Deputy Knight and another officer picked up Walker from jail and escorted him back to his home.
 
 [3]
 
 Once Deputy Knight and Walker returned, the home was searched. The search yielded the cardboard box and a t-shirt that Major Shumpert believed was worn by the burglar shown on the videotape.
 

 ¶ 5. The jury was then shown the videotape of the burglary while Major Shum-pert narrated the events. Major Shum-pert testified that the cardboard box found behind the Walker home was the same box seen being taken on the surveillance videotape. Major Shumpert further testified that the t-shirt was found on Walker’s bed, and based upon the writing and graphic on the t-shirt, it was his opinion that it looked like the t-shirt the burglar was wearing during the commission of the crime.
 

 ¶ 6. During cross-examination of Major Shumpert, he stated that he identified Walker when he looked up at the camera while he was entering the Junior Food Mart on his hands and knees. When asked if he was sure the person on the videotape was Walker, Major Shumpert stated that he was absolutely sure. He explained that he was sure because the perpetrator looked up at the video camera during the burglary and because of the mild limp that the burglar had.
 

 ¶ 7. Major Shumpert was not absolutely sure that the cardboard box found behind the Walker home was the same box stolen from the Junior Food Mart. However, he continued that the box contained grocery tags that coincided with the Junior Food Mart’s unique grocery number and some empty coin rolls were found underneath the interior flaps of the box. Major Shum-pert explained that a clerk at the Junior Food Mart told him that the box was used as a receptacle for empty coin rolls.
 

 ¶ 8. Dimple Cungious was the manager of the Junior Food Mart at the time of the burglary. She stated that the Junior Food Mart closed at 12:00 a.m. and opened at 6:00 a.m. every morning. Cungious testified that the box found behind Walker’s home was the same box that had been stolen from the Junior Food Mart. She testified that the box was kept beneath the Junior Food Mart’s counter and was used to store coin rolls. Cungious explained that she was able to identify the recovered cardboard box as the one stolen from the Junior Food Mart from personal experience with it and from the fact that it contained several grocery labels on its exterior. Cungious explained that a local grocery store made deliveries to the Junior Food Mart using cardboard boxes such as the one found behind the Walker home. The boxes contained a label listing a unique number associated with the recipient of the groceries. Cungious testified that the Junior Food Mart’s unique grocery number was 264004. Furthermore, she stated that three of the grocery labels on the cardboard box found behind the Walker home listed the Junior Food Mart’s grocery number.
 

 ¶ 9. Walker attempted to establish an alibi defense during his case-in-chief. Sampson Everett stated that Walker and Walker’s brother came to Everett’s house at approximately 3:00 p.m. or 4:00 p.m. on February 18, 2009, to play cards. According to Everett, Walker left between 10:30
 
 *655
 
 p.m. and 11:00 p.m. with a man named Cedric Collins.
 

 ¶ 10. Walker’s mother, Rosie Mae Walker, testified that she was rearranging her furniture when Walker came home at approximately 11:00 p.m. with a friend of his named “Ced.” Walker subsequently took a bath and went to sleep approximately twenty to thirty minutes later. Rosie initially testified that she went to sleep at 1:00 a.m., but later she stated that it was between 2:00 a.m. and 3:00 a.m. Further, she stated that she woke up at 6:00 a.m. to get ready for work.
 
 [4]
 
 She testified that Walker was home when she went to bed, when she woke up for work at 6 a.m., and when she got to work at approximately 8:00 a.m.
 

 ¶ 11. During cross-examination, Rosie stated that she came home from work the day her home was searched and found two deputies finishing the search of her home. Rosie’s friend, who she was with at the time, asked, “What did you find?” The deputies, who were black according to Rosie’s testimony, stated, “We didn’t find nothing.” However, Deputy John Lay was called by the State on rebuttal. He stated that the only two deputies involved in the search were himself and Deputy Knight. Deputy Lay confirmed that he and Deputy Knight were Caucasian. Additionally, Rosie later testified that the officers told her they found a white t-shirt on the bed, which was inconsistent with her previous testimony that she was told they did not find anything. Rosie explained that she had just washed the t-shirt but had not had time to put it up. As to the box, she testified that she never saw the box behind her house and accused law enforcement of planting the box. Similarly, Walker’s brother, Tyrone Walker, testified that he lives in the house directly behind his mother’s home and passed by the area where the box was found the morning before the search. Tyrone stated that he did not see any cardboard box.
 

 ¶ 12. Finally, Walker testified on his own behalf. He testified that he was playing cards at Everett’s house until approximately 11:00 p.m. He stated after he got home he took a bath, went to sleep, and did not wake up until 10:00 a.m. the next day. He claimed that he had neither broken into the Junior Food Mart nor seen the cardboard box before trial. As for the t-shirt that was found on his bed, Walker stated that the t-shirt was his but that it was an extremely popular shirt and many people in the neighborhood owned one.
 

 DISCUSSION
 

 WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING WALKER’S MOTION FOR A NEW TRIAL.
 

 ¶ 13. Walker’s sole issue raised on appeal is that the trial court abused its discretion when it denied his motion for new trial as the weight of the evidence presented during his trial cannot sustain the jury’s verdict. An appellate court reviews a trial court’s denial of a motion for new trial under an abuse-of-discretion standard.
 
 Dilworth v. State,
 
 909 So.2d 731, 737 (¶ 20) (Miss.2005). That is, “we will not order a new trial unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice.”
 
 McLendon v. State,
 
 945 So.2d 372, 385 (¶ 40) (Miss.2006) (quoting
 
 Groseclose v. State,
 
 440 So.2d 297, 300 (Miss.1983)). Reviewing the evidence under this standard requires that the evidence be weighed in the light most favorable to the verdict.
 
 Mitchell v. State,
 
 572
 
 *656
 
 So.2d 865, 867 (Miss.1990). Furthermore, all “evidence consistent with the defendant’s guilt is accepted as true together with any reasonable inferences that may be drawn from that evidence.”
 
 Young v. State,
 
 891 So.2d 813, 821 (¶ 21) (Miss.2005) (citing
 
 Heidel v. State,
 
 587 So.2d 835, 838 (Miss.1991)).
 

 ¶ 14. The evidence at trial included the State’s uncontradicted testimony of Officer Edwards and Major Shumpert that when they viewed the surveillance videotape they recognized Walker as the burglar. The videotape showed the assailant entering the store through the broken bottom half of the Junior Food Mart’s glass door, quickly looking up at the surveillance camera, and placing a t-shirt or towel over his head. The burglar then took a Marlboro cardboard box from under the front counter and filled it with cigarettes and other merchandise from the Junior Food Mart. Finally, the burglar walked around the counter, picked up the box, and left the store. While he was walking toward the front door to the Junior Food Mart, the front of the clothing he was wearing was in full view of the surveillance
 
 camera.
 
 Furthermore, there was uncontradicted testimony that the cardboard box found behind Walker’s home was the cardboard box stolen from the Junior Food Mart. Additionally, Major Shumpert testified that the t-shirt found on Walker’s bed appeared to be the t-shirt the burglar was wearing on the videotape. Finally, the jury was able to view the videotape and draw their own conclusions.
 

 ¶ 15. Mississippi Code Annotated section 97-17-33(1) states that: “Every person who shall be convicted of breaking and entering, in the day or night, any shop, store ... in which any ... valuable thing shall be kept for use, sale, deposit, or transportation, with intent to steal therein, or to commit any felony ... shall be guilty of burglary....” Although there was testimony from Walker and others on his behalf that he did not commit the burglary, and he was at home and asleep at the time, we find that the evidence presented, when viewed in a light most favorable to the verdict, is of sufficient weight that his conviction cannot be said to be an unconscionable injustice. Further, the testimony elicited in support of Walker’s alibi was tenuous at best. Other than Walker’s own testimony, only Rosie testified that Walker was sleeping during the period of time that the burglary could have taken place. Besides the fact that Rosie’s testimony regarding when she went to sleep was inconsistent, Walker still had a window of opportunity to commit the burglary even if it is assumed that Rosie chose to go to sleep between 2:00 a.m. and 3:00 a.m. Regardless, based on the verdict, it is clear which version of events the jury chose to believe. As the supreme court has stated:
 

 when the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony. This wise rule applies with equal force to the state’s witnesses and the appellant’s witnesses, including the appellant himself. [The supreme court has] repeatedly held that in a criminal prosecution the jury may accept the testimony of some witnesses and reject that of others, and that they may accept in part and reject in part the evidence on behalf of the State or on behalf of the accused. In other words, the credibility of witnesses is not for the reviewing court.
 

 Gathright v. State,
 
 380 So.2d 1276, 1278 (Miss.1980). As such, this issue is without merit.
 

 ¶ 16. THE JUDGMENT OF THE CIRCUIT COURT OF MONROE COUNTY OF CONVICTION OF BURGLARY
 
 *657
 
 OF A BUILDING AND SENTENCE OF SEVEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIVE YEARS TO SERVE, TWO YEARS SUSPENDED, AND TWO YEARS OF POST-RELEASE SUPERVISION, AND TO PAY A $1,000 FINE, A $100 ASSESSMENT TO THE MISSISSIPPI CRIME VICTIMS’ COMPENSATION FUND, AND $885.62 IN RESTITUTION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO MONROE COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ„ CONCUR.
 

 [1]
 

 . Officer Edwards stated that the initial call indicating that a burglary had taken place came from a newspaper delivery person who noticed that the glass door to the Junior Food Mart had been broken.
 

 [2]
 

 . When Major Shumpert found the box, he did not have a camera on his person so he picked up the box and placed it inside his truck before later photographing it.
 

 [3]
 

 . Walker was retrieved from jail because he had a key to the Walker home.
 

 [4]
 

 . Rosie testified that she stayed up late most nights.